UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL U. JAMES,

        Plaintiff,

v.                                Civil Case No. 18-11135
                                   Honorable Linda V. Parker

QUANTA SERVICES, INC. and
INFRASOURCE, LLC,

        Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 24)

Plaintiff Michael "Mike" U. James is a former employee of Defendants InfraSource, LLC and parent-company Quanta Services, Inc., and was the only African-American in Defendants' Hamtramck, MI office. Plaintiff brought this action alleging Defendants (i) subjected him to a hostile work environment; (ii) failed to promote him because of his race; and (iii) terminated him because of his race. Presently before the Court is Defendants' motion for summary judgment. (ECF No. 24.) The motion has been fully briefed. (ECF No. 26, 27.) Finding the facts and legal arguments sufficiently presented in the parties' briefs, the Court dispensed with oral argument pursuant to Local Rule 7.1(f). For the reasons that follow, the Court grants in part and denies in part Defendants' motion.

1

## FACTUAL BACKGROUND

On May 12, 2014, Plaintiff was employed as an Area Safety Manager at InfraSource and, in the spring of 2016, was transferred to Defendants' facility in Hamtramck, MI ("Hamtramck Worksite").  As an Area Safety Manager, Plaintiff trained employees regarding safety protocol, and investigated on-the-job accidents and incidents.  Plaintiff reported to Oscar Paredes, the Director of Safety who was hired in January 2017 and worked out of InfraSource's headquarters in Kansas City, KS.  (Paredes Dep., ECF No. 26-4 at Pg. ID 562.)  Butch McAreavy was the Director of Operations for all of Defendants' Michigan and Ohio worksites and worked out of the Hamtramck Worksite.  (McAreavy Dep., ECF No. 26-5 at Pg. ID 619.)  Though the Safety and Operations Departments have separate chains of command, McAreavy testified that he indirectly supervises employees in the Safety Department.  (*Id*. at Pg. ID 608, 611-12.)

### Defendants Assign Office Space at the Hamtramck Worksite

When Plaintiff began working in the Hamtramck Worksite, a warehouse held the only office space available for all employees.  Operations Manager Michael Shoemaker, General Foreman Thomas Bradley, General Foreman Jason Thibault,[1] and Plaintiff worked in the warehouse.  (*See id*. at Pg. ID 610, 624.)

---

[1] The record suggests that Shoemaker, Bradley and Thibault worked in the Operations Department. According to Plaintiff, Roy Howell is "[t]he highest ranking individual" at the Hamtramck Worksite and Shoemaker is the "second-in-

Employees discussed whether, given the age of the warehouse, it might contain asbestos or lead.  (Defs. MSJ, ECF No. 24 at Pg. ID 97 (citing Pl. Dep., ECF No. 24-2 at Pg. ID 141)).  In addition, the warehouse did not have air-conditioning and it is unclear whether the heater worked consistently.

In the summer of 2016, Defendants acquired a modern, climate-controlled trailer that held new offices.  The parties do not dispute that all of the aforementioned employees—except for Plaintiff—were moved into the new trailer.

Plaintiff declares that Shoemaker told him that he could not have a trailer office and had to stay in the warehouse, even though two or three trailer offices were available.  (Pl. Decl., ECF No. 26-2 at Pg. ID 480.)  When Plaintiff made the same request to McAreavy, McAreavy also told Plaintiff that he could not have a trailer office.  (*Id.*)  McAreavy denies having this conversation with Plaintiff. (McAreavy Dep., ECF No. 26-5 at Pg. ID 625.)

### **Defendants' Employees Engage in Allegedly Race-Based Incidents**

Plaintiff describes incidents where Defendants' employees allegedly made racially derogatory remarks or engaged in hostile conduct directed at Plaintiff and/or the African-American race.  In addition to being denied trailer office space, these incidents include:

---

command."  (Pl. Dep., ECF No. 26-3 at Pg. ID 503.)  Plaintiff also explained that "all of the field employees in Hamtramck" report to the General Foremen.  (*Id.* at Pg. ID 543.)

- Bradley and Thibault told Plaintiff that they did not want a black person using the bathroom in the new trailer, and refused Plaintiff's entry into the trailer bathroom, (Pl. Decl., ECF No. 26-2 at Pg. ID 480);

- While Plaintiff attempted to fix a screw on his belt, Thibault stated "[p]ull your damn pants up.  Nobody want to see your ass, pants sagging like that . . . [Y]ou know what sagging means backwards, don't you? . . . It means you're [a] nigger." (Pl. Dep., ECF No. 26-3 at Pg. ID 547.) Several employees laughed in response, (Pl. Decl., ECF No. 26-2 at Pg. ID 481);

- During a Christmas party, Bradley introduced his sister to Plaintiff in front of a large crowd and, when Plaintiff gestured to shake the sister's hand, Bradley stated, "[d]on't touch my sister hand[;] [s]he don't do the black thing."  Co-workers laughed in response and, the next day, McAreavy informed Plaintiff that he would not discipline Bradley because Bradley was only "joking," (Pl. Dep., ECF No. 26-3 at Pg. ID 544);

- Bradley stated "[i]f [my daughter] ever bring[s] a black man to my doorstep . . . I got a noose and a tree out in the front yard."  Bradley then tapped on a picture of Plaintiff's bi-racial son (which was located on Plaintiff's desk), and stated, "[b]ecause I know you black men[] like white women . . . . Yeah, I know you basketball ex-athletes like . . . white women," (*id.* at Pg. ID 548);

- On one occasion, while referencing a Caucasian woman that Bradley described as overweight, Bradley asked Plaintiff, "[w]hy don't [you] go stick some black dick in her mouth to shut her up," (*id.* at Pg. ID 545-46);

- On another occasion, after "hav[ing] some words with" and being "angered" by the aforementioned woman, Bradley asked Plaintiff, "[w]hy don't you just go back there . . . and stick your big black dick in her ass . . . and shut her up," (*id.* at Pg. ID 546);

4

- On a different occasion, after Plaintiff offered to get lunch for a Caucasian female colleague, Bradley asked, "[w]hy don't you just go down there and fill her up, that . . . big ass up with some black dick.  That will fill her up."  Shoemaker, Thibault, and another employee laughed in response, (*id*.);

- When Plaintiff and Bradley heard a bell ringing from an Islamic mosque, Bradley asked, "[w]hen we getting the fuck out of this ISIS and terrorist neighborhood?"  When Plaintiff responded, "[t]hese people not doing anything" and "[w]e are in their neighborhood," Bradley stated, "[o]h, what do you know?  You used to smoking blunts, listening to Tupac Shakur, and killing each other the fucking hood."  After Plaintiff said, "why are you saying stuff like that . . . Those stuff is going to get you in trouble," Bradley responded, "[w]hat are you going to do, go get Al Sharpton and Reverend Jesse Jackson? . . . I got something for them.  I got a treat in my yard for them," (*id.*);

- In August 2017, Doty stated, "I'm sick and tired of a black man with a little education under his belt trying to make something out to what it's really not," (*id*. at Pg. ID 525).

Plaintiff declared that "[t]he racist and sexual comments that Thomas Bradley and others said to [him] were made in public and [his] co-workers and supervisors heard them and laughed at [Plaintiff]."  (Pl. Decl., ECF No. 26-2 at Pg. ID 480.)

## Defendants Fill a Regional Safety Manager Position

In early 2017, Paredes sought to fill a newly-created Regional Safety Manager position, a position that included supervision of Area Safety Managers like Plaintiff.   Plaintiff testified in this matter that Paredes told Plaintiff he would receive the promotion and Paredes would speak with McAreavy to inform him of

5

this decision.  (Pl. Dep., ECF No. 24-2 at Pg. ID 148.)  According to Plaintiff, however, "[Paredes] came back and told [Plaintiff] that [McAreavy] had shot that down and that [Paredes] wasn't going to be able to give [Plaintiff] that position because they had someone else."  (*Id.*)  Paredes denies having these conversations with Plaintiff.  (Paredes Dep., ECF No. 26-4 at Pg. ID 587.)

In April or May of 2017, Paredes hired James Goble, a Caucasian male and veteran of InfraSource who left the company in 2016 and wanted to return.  (*See id.* at Pg. ID 568.)  Paredes noted during his deposition that, among other things, Goble (i) had more than 15 years of experience in the safety field, at least "double" that of Plaintiff and (ii) even had experience in "OQ" (Operational Qualification), though the Safety Department does not handle this type of work.  (*Id.* at Pg. ID 579.)

Plaintiff believes that he was more qualified for the job because Plaintiff (i) held a four-year degree in Occupational Safety, whereas Goble held only a high school diploma; (ii) possessed several certifications related to the safety field, where as Goble did not; and (iii) had completed a training course called *Stepping Up to Supervision*, where as Goble completed the same course only after Defendants hired him.  (Pl. Resp., ECF No. 26 at Pg. ID 457.)

## Defendants Terminate Plaintiff's Employment

On August 23, 2017, Plaintiff was called to investigate an accident, in which a "city light pole had [] fallen into the street near the company work zone." (Pl. EEOC Statement, ECF No. 24-8 at Pg. ID 401.) At the time of the accident, Mark Doty and Alex Garrett were operating the machinery at the site. Plaintiff arrived onsite but it is unclear from the record whether he spoke with Doty at that time. Later that afternoon, Plaintiff called Garrett to obtain a statement about the accident. Shortly thereafter, Plaintiff received a call from or made a call to Doty. According to Plaintiff, Doty was very angry and stated, "I'm sick and tired of a black man with a little education under his belt trying to make something out to what it's really not." (Pl. Dep., ECF No. 26-3 at Pg. ID 525.)

The next morning, on August 24, Plaintiff saw Doty in the InfraSource parking lot and drove up beside him. Plaintiff asked Doty to come to Plaintiff's office to write a statement. (*Id.* at Pg. ID 530.) At that same time, Plaintiff was on a call with a friend, Lillian Brezzell, who declared that Plaintiff "spoke calmly, never raised his voice, and never used profanity." (Brezzell Decl., ECF No. 26-6 at Pg. ID 649.) In contrast, Doty was "extremely loud and vulgar," sounded "very angry and aggressive," and at one point said, "[f]uck you man! I'm not going fucking nowhere!" (*Id.*)

Doty further stated he was not going to do anything until Shoemaker arrived to the worksite.  (Pl. Dep., ECF No. 26-3 at Pg. ID 530.)  The record suggests that Shoemaker had not yet arrived, so Plaintiff—ahead of Doty—went to Thibault's office and requested help with getting Doty and Garrett to write statements regarding the accident that occurred the previous day.  (*Id.* at Pg. ID 531.)  Upon exiting Thibault's office, Plaintiff encountered Doty and Garrett who were walking toward Thibault's office.  (*Id.* at Pg. ID 532-33.)  Plaintiff and Doty, again, yelled and exchanged words.  (*Id.*)  Though it is unclear whether Doty then entered Thibault's office or remained outside of the office, the record shows that Thibault shut his office door and Plaintiff opened the door, demanding that Thibault call "the authorities" because "this is becoming a hostile environment."  (*Id.* at Pg. ID 533.)

An argument between Plaintiff and Doty ensued inside of Thibault's office. Though the record shows that Plaintiff and Doty never made physical contact with one another, what exactly happened next is unclear.  Defendants claim that Plaintiff "charged" at Doty and had to be restrained by other employees.  (Paredes Dep., ECF No. 26-4 at Pg. ID 591-92.)  Plaintiff, on the other hand, claims that he did not charge at Doty and did not have to be restrained.  (Pl. Dep., ECF No. 26-3 at Pg. ID 534-35.)

Shortly after the altercation, McAreavy directed Paredes and Goble to collect witness statements.  (ECF No. 26-5 at Pg. ID 638.)  Ultimately, after speaking with McAreavy and Goble, Paredes made the decision to terminate Plaintiff's employment, finding that Plaintiff's "charge" toward Doty was a violent or threatening act that violated the company's Core Values.  (Paredes Dep., ECF No. 26-4 at Pg. ID 597.)  Paredes also cited concern about Plaintiff's ability to continue presenting safety training and conducting safety investigations with the "same group of workers."  (*Id*. at Pg. ID 601.)

## STANDARD

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of

an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a reasonable jury could find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor.  *See Liberty Lobby*, 477 U.S. at 255.

## APPLICABLE LAW & ANALYSIS

### Hostile Work Environment Claim

Title VII of the Civil Rights Act of 1964 ("Title VII") offers employees protection from a "workplace [ ] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). The hostile work environment analysis "has both an objective and a subjective component: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as hostile or abusive." *Harris*, 510 U.S. at 21-22.

Here, Defendants do not contest the subjective component. To satisfy the objective component:

> [A] plaintiff must demonstrate that (1) []he belonged to a protected group, (2) []he was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999)).

11

To support their motion for summary judgment as to this claim, Defendants contest the fourth and fifth part of the objective component analysis.

### *(I) Was the Harassment Sufficiently Severe or Pervasive to Alter the Conditions of Employment and Create an Abusive Working Environment?*

Defendants contend that "a few incidents over a period of eighteen months fail to meet the 'relatively high bar' of severity or pervasiveness that the Sixth Circuit has established for racial [] harassment." (ECF No. 24 at Pg. ID 89-90.)

Notably, however, in determining whether conduct is severe or pervasive enough to constitute a hostile work environment, the Sixth Circuit has "not . . . set a required number of incidents," *Ault v. Oberlin Coll*., 620 F. App'x 395, 402 (6th Cir. 2015), and courts do not consider frequency alone, *Harris*, 510 U.S. at 23.[2] Rather, the Sixth Circuit has explained that courts should consider "the totality of the circumstances," including "the frequency of the . . . conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. In addition, in considering the totality of the circumstances, courts should not disaggregate the various incidents, as "this would inappropriately rob them of their cumulative effect." *Williams v. Gen. Motors Corp*., 187 F.3d 553, 562 (6th Cir.

---

[2] For this reason, the Court finds unpersuasive Defendants' bareboned argument that, in *Williams v. CSX Transp. Co*., "fifteen specific incidents spanning a two-month period were isolated and were not pervasive." (ECF No. 24 at Pg. ID 116.)

1999).  Rather, "[e]ach incident of harassment contributes to the context in which every other incident occurs."  *Id.* at 563 n.4.  As the Sixth Circuit noted:

> [A] holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes.

*Id.* at 563 (internal quotation marks and citation omitted)).

Plaintiff's brief identifies numerous incidents—all of which took place during his 18-month tenure—as evidence establishing a hostile work environment.  (*See supra* Factual Background:  Defendants' Employees Engage in Allegedly Race-Based Incidents.)[3]

A reasonable jury could find that these incidents were "frequent" or "severe."  *Ault*, 620 F. App'x at 402 ("Relief may be available where the conduct is severe *or* pervasive; it need not be both." (alteration in original)).  Critically, in *Johnson v. United Parcel Servs., Inc.*, the Sixth Circuit found that "[t]he severity of the discriminatory conduct was high[] for various reasons," including because

---

[3] Defendants argue that Plaintiff's claim of harassment concerning the location of his office was "not racial in nature."  (ECF No. 24 at Pg. ID 114-15.)  A reasonable jury could disagree because Plaintiff alleged that Caucasian employees received offices inside the new trailer and Defendants disregarded his several requests to receive the same.  (*See* ECF No. 26-2 at Pg. ID 480.)  *See Jackson v. Quanex Corp.,* 191 F.3d 647, 658 (6th Cir. 1999) ("[H]arassment [can be proven] . . . by . . . comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace.").

"[c]ase law makes clear that the use of the word 'nigger,' even taken in isolation, is not a 'mere offensive utterance.'"  117 Fed. Appx. 444, 454 (6th Cir. 2004).

Additional evidence of "severity" lies in the fact that all of the alleged comments and incidents were arguably directed at Plaintiff specifically.  *Burnett v. Tyco Corp*., 203 F.3d 980, 983 (6th Cir. 2000) (noting that an important factor is whether the comments were directed at the plaintiff).  Indeed, the allegations included derogatory and profane remarks directed at Plaintiff, offensive comments directed at African-Americans in general, and the exclusion of Plaintiff from workplace areas—namely, the new trailer and bathroom located in the new trailer. *See Burnett*, 203 F.3d at 984.

In addition, in *Abeita v. TransAmerica Mailings, Inc*., the Sixth Circuit reversed summary judgment granted to the defendant on a hostile work environment claim, holding that the district court's analysis omitted the plaintiff's claim that the defendant's comments were "commonplace," "ongoing," and "continuing."  159 F.3d 246, 252 (6th Cir. 1998).  Here, Plaintiff testified that Bradley "was always constantly downgrading the black race" and engaged in "an ongoing pattern with racist comments."  (ECF No. 26-3 at Pg. ID 546.)[4]  Indeed,

---

[4] Defendants argue that Plaintiff, during his deposition, confirmed only five or seven, incidents with racial content and cannot now argue that the incidents happened "daily."  (ECF Nos. 24 at Pg. ID 115; 27 at Pg. ID 685.)  The Court agrees that Plaintiff's deposition suggests that there were a finite number of incidents (though the number is more than five or seven).  However, the deposition

Plaintiff has, at a minimum, come forward with sufficient evidence to create a material question of fact regarding whether the alleged racial harassment was frequent or severe.

Notably, Defendants do not dispute that these comments and the physical isolation, if true, were humiliating to Plaintiff.  (*See* ECF No. 24 at Pg. ID 114-16.) Plaintiff declared as much, stating that "[t]he racist/sexual comments humiliated me."  (ECF No. 26-2 at Pg. ID 481.)  When testifying about the events at the Christmas party, Plaintiff stated, "it was embarrassing and insulting[] because the bar was full of people that I work with and work around, and [I was] the only black man there . . . for him to just . . .call me out like that . . . was very offending." (ECF No. 26-3 at Pg. ID 545.)  Indeed, these comments and the physical isolation were not merely crude, offensive utterances and actions, and a jury could view them as offensive to any African-American person in a work environment.

Finally, there is evidence that these incidents unreasonably interfered with Plaintiff's ability to do his job.  Plaintiff testified that, "[a]s a [S]afety [M]anager, it

---

also suggests more incidents may have occurred:  when asked, "[a]nything else that you recall Mr. Bradley saying that you found to be offensive or harassing," Plaintiff stated that Bradley "was always constantly downgrading the black race" and engaged in "an ongoing pattern with racist comments."  "[I]f conflicting testimony appears in affidavits and depositions . . ., summary judgment may be inappropriate as the issues involved will depend on the credibility of the witnesses."  *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013).  Such is the case here.

is important that co-workers respect me and listen to my advice."  (ECF No. 26-2 at Pg. ID 481.)  According to Plaintiff, these incidents "caused [him] to lose the respect of [his] co-workers and made it very difficult for [him] to do [his] job." (*Id.*); *see Davis v. Monsanto Chem. Co*., 858 F.2d 345, 349 (6th Cir. 1988) ("In establishing the requisite adverse effect on work performance . . . the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment.  The employee need only show that the harassment made it more difficult to do the job.").

The various incidents Plaintiff presents, when viewed as a whole and in their proper context, could lead a rational trier of fact to conclude that they were "work-sabotaging behavior that create[d] a hostile work environment."  *Williams v. Gen. Motors Corp*.,187 F.3d at 564.

### *(II) Did Defendants Know or Should They Have Known About the Harassment and Did They Fail to Act?*

Defendants argue that the *Faragher/Ellerth* defense entitles them to summary judgment as to Plaintiff's hostile work environment claim.  (ECF No. 24 at Pg. ID 113-14.)  To prevail on this affirmative defense, Defendants must prove, by a preponderance of the evidence, that (1) they "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [Defendants] or to avoid harm otherwise."  *Faragher v.*

*City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

The Sixth Circuit has explained that, "[g]enerally, an employer satisfies the first part of this two-part standard when it has promulgated *and* enforced a [anti-]harassment policy." *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008) (emphasis added) (citing *Ellerth*, 524 U.S. at 765 and *Faragher*, 524 U.S. at 807). Plaintiff does not dispute in his response brief that Defendants *promulgated* a facially effective anti-harassment policy. (*See* ECF No. 26 at Pg. ID 472-73.)

However, it is less clear whether Defendants *enforced* the anti-harassment policy. Under Sixth Circuit law, "[a]n effective harassment policy should at least . . . require supervisors to report incidents of [racial] harassment." *Thornton*, 530 F.3d at 456 (quoting *Clark v. United Parcel Serv., Inc.*, 400 F.3d at 341, 349–50 (6th Cir. 2005)). For the purpose of summary judgment, the Court accepts as true Plaintiff's assertion that "[t]he racist and sexual comments that Thomas Bradley and others said to [him] were made in public and [his] co-workers and supervisors heard them and laughed at [him]." (ECF No. 26-2 at Pg. ID 480.) Notably, the record does not show that Defendants reported or otherwise responded to any of the alleged racial harassment—much less in a manner "reasonably calculated to

end the harassment."[5]  Accordingly, the Court finds that a reasonable jury could find that Defendants' pattern of unresponsiveness constituted a failure to enforce the anti-harassment policy and to exercise care reasonably calculated to correct the alleged racial harassment.

As to the second element, Defendants contend that "Plaintiff's unreasonable failure to report harassment allegations to the Human Resources Department establishes Defendant[s'] affirmative defense under *Faragher/Ellerth*." (ECF No. 24 at Pg. ID 89-90.)  The Sixth Circuit, however, has previously opined on this argument, finding it unpersuasive:

> [W]e must address the district court's reference to the fact that to be actionable, racially harassing conduct "must be reported." Significantly, nowhere do the above delineated standards specify that the plaintiff, or any other individual, must "report" the offensive conduct of co-workers to the employer.  Rather, to succeed, the plaintiff must establish that the employer "knew or should have known" of the offenses.

*Quanex*, 191 F.3d at 663; *see also Baugham v. Battered Women, Inc*., 211 F. App'x 432, 439 (6th Cir. 2006) (citing *Randolph v. Ohio Dep't of Youth Servs*., 453 F.3d 724, 735 (6th. Cir. 2006) (finding summary judgment improperly granted

---

[5] *See Jackson v. Quanex Corp*., 191 F.3d 647, 663 (6th Cir. 1999) ("As for the acts of co-workers, a plaintiff may hold an employer directly liable if she can show that the employer knew or should have known of the conduct, and that its response manifested indifference or unreasonableness. . . . Significantly, a court must judge the appropriateness of a response by the frequency and severity of the alleged harassment. . . . Generally, a response is adequate if it is reasonably calculated to end the harassment." (citations omitted)).

where the plaintiff's testimony indicated supervisors were aware of the harassment

but largely ignored it)); *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d

263, 275 (6th Cir. 2009) (deeming employer to have notice of harassment where

the plaintiff's supervisor was present during and witnessed much of the conduct by

the plaintiff's co-workers and participated in some of it).

Here, based on Plaintiff's testimony, a genuine issue of material fact exists

as to whether Defendants knew or should have known of the alleged racial

comments.  Accordingly, Defendants' argument fails as to this element of the

affirmative defense and the Court denies summary judgment as to Plaintiff's

hostile work environment claim.

## Race Discrimination Claims

Plaintiff claims violations of race discrimination under Title VII, 42 U.S.C.

§ 1981, and the Elliot-Larson Civil Rights Act ("ELCRA") for Defendants' failure

to promote and for Plaintiff's subsequent termination.  (ECF No. 1.)  "[C]laims of

alleged race discrimination brought under [42 U .S.C.] § 1981 and the [ELCRA]

[are reviewed] under the same standards as claims of race discrimination brought

under Title VII."  *Quanex*, 191 F.3d at 658.

Title VII's antidiscrimination provision makes it unlawful for an employer

to discriminate against any individual with respect to, among other things, his race.

*See* 42 U.S.C. § 2000e–2(a)(1).  Discrimination claims under Title VII can be

proven by direct or circumstantial evidence.  *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648 (6th Cir. 2012).

"Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp*., 176 F.3d 921, 926 (6th Cir. 1999).  Here, Plaintiff does not proffer any direct evidence of race discrimination by the supervisors who played a role in the decision not to promote him (Paredes and McAreavy) or the supervisors who played a role in the decision to terminate his employment (Paredes, McAreavy, and Goble).  *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004) (explaining that statements allegedly constituting direct evidence must be made by the decisionmakers "in relation to the decision").

"Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."  *Ondricko*, 689 F.3d at 649 (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)).  When analyzing circumstantial evidence, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006) (citation omitted).  Before the burden shifts to the employer, a plaintiff must establish a *prima facie* case of

discrimination by a preponderance of the evidence.  *Id.* at 707.  The Sixth Circuit

has consistently held that a plaintiff's burden of establishing a *prima facie* case is

not onerous, *see Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir.

2000) (citation omitted), and is "a burden easily met," *Wrenn v. Gould*, 808 F.2d

493, 500 (6th Cir. 1987) (citations omitted).

      If the plaintiff makes out a *prima facie* case, "[t]he burden of production

then shifts to the defendant to articulate a legitimate, non-discriminatory reason for

its actions.  To prevail, the plaintiff must then prove by a preponderance of the

evidence that the defendant's proffered reason is not its true reason but a pretext

for discrimination."  *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th

Cir.), *opinion supplemented on denial of reh'g*, 266 F.3d 407 (6th Cir. 2001)

(citation omitted).  Notably, a plaintiff "need only identify genuine disputes of fact

regarding the legitimacy of the defendant's stated reasons."  *Wheat v. Fifth Third

Bank*, 785 F.3d 230, 237 (6th Cir. 2015).

### *(I) Failure to Promote Based on Race*

      To establish a *prima facie* case of race discrimination for a defendant's

failure to promote, a plaintiff must show that "(1) []he is a member of a protected

class[;] (2) []he applied for and was qualified for a job for which the employer was

seeking applicants; (3) that, despite h[is] qualifications, []he was rejected for the

job; and (4) that other employees of similar qualifications who were not members

of the protected class were promoted at the time plaintiff's request for a promotion was denied." *See McDonnell Douglas*, 411 U.S. at 802; *Abrams v. Johnson*, 534 F.2d 1226, 1230-31 (6th Cir. 1976) (adapting *McDonnell Douglas* to a failure to promote claim).  Here, Defendants do not dispute that Plaintiff has established a *prima facie* case of race discrimination for failure to promote.  (ECF No. 24 at Pg. ID 88-89.)  The burden, therefore, shifts to Defendants to offer a legitimate, non-retaliatory reason for their decision.

In their brief, Defendants state that Plaintiff was denied a promotion because Paredes "valued length of employment with InfraSource specifically and in the pipeline industry generally . . . and chose a candidate with twenty-six years of service at InfraSource rather than Plaintiff, who had only three years in the pipeline industry at InfraSource."  (*Id.* at Pg. ID 89.)  Defendants contend that Plaintiff may not "second-guess" Paredes' decision that "Goble's twenty-six years at [InfraSource] outweighed Plaintiff's degree."  (*Id.* at Pg. ID 113.)  In response, Plaintiff argues that fact questions remain as to "whether Goble's hiring was simply due to experience . . . or due to discrimination."  (ECF No. 26 at Pg. ID 470.)

When all reasonable inferences are given to Plaintiff's evidence, a dispute about whether Defendants' proffered reason is pretextual precludes summary judgment as to this claim.  Plaintiff testified that Paredes told him that he would

receive the promotion and that Paredes would speak with McAreavy to inform him of this decision.  (ECF No. 24-2 at Pg. ID 148.)  According to Plaintiff, however, "[Paredes] came back and told [Plaintiff] that [McAreavy] had shot that down and that [Paredes] wasn't going to be able to give [Plaintiff] that position because they had someone else."  (*Id.*)  In stark contrast, Paredes denies ever having such conversations with Plaintiff and when asked during deposition if "anyone ever [told him] not to hire [Plaintiff] for that promotion," Paredes responded, "absolutely not."  (ECF No. 26-4 at Pg. ID 587.)  If a jury believes Plaintiff's version of facts, the jury could reasonably conclude that Defendants proffered reason for their decision is pretextual because Paredes would not have offered Plaintiff the promotion in the first place if Paredes actually valued Goble's experience over Plaintiff's.

The conclusion that Defendants' proffered reason is pretextual is further supported by Plaintiff's evidence that McAreavy—one of the individuals who played a role in the decision not to promote Plaintiff—displayed racial animus against Plaintiff when refusing to give Plaintiff an office in the new trailer, despite the fact that all of Plaintiff's Caucasian counterparts received one and Plaintiff requested one.  (ECF No. 26-2 at Pg. ID 480.)  Viewing this incident against the backdrop of the evidence of pretext discussed above, the Court concludes that Plaintiff has presented evidence that could support the inference that race-based

discriminatory animus played a role in Defendants' decision to deny Plaintiff the promotion. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998) ("[W]hen assessing the relevancy of an allegedly biased remark where the plaintiff presents evidence of multiple discriminatory remarks or other evidence of pretext, we do not view each discriminatory remark in isolation, but are mindful that the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus.").

The Court, therefore, denies summary judgment as to Plaintiff's failure to promote claim.

### *(II) Termination Based on Race*

To establish a *prima facie* case for termination based on race, Plaintiff must show the following elements: "1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) he was . . . treated less favorably than a similarly situated individual outside of his protected class" for the same or similar conduct. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (footnote and citation omitted); *see Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 561 (6th Cir. 2004) (citations omitted).

Defendants do not dispute that Plaintiff has established a *prima facie* case of race discrimination. (ECF No. 24 at Pg. ID 88-89.) The burden therefore shifts to

Defendants.  Defendants contend that they had a legitimate, non-discriminatory reason for their decision:  Plaintiff was "involve[d] in a fracas with an employee." (*Id*.)  More specifically, Defendants contend that, even though it was "verbal on both sides," Plaintiff was terminated because he "charged" at Doty, while Doty did not "charge" at Plaintiff.  (ECF Nos. 27 at Pg. ID 683 n.3; 26-4 at Pg. ID 599.) The burden next shifts to Plaintiff to show that Defendants' proffered reason is pretextual.

A plaintiff may establish pretext "by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the adverse action; or (3) were insufficient to explain the adverse action."  *Kirkland v. James*, 657 Fed. Appx. 580, 586 (6th Cir. 2016) (citation omitted).  Plaintiff does not indicate which of these three methods of establishing pretext applies to his claim.  Thus, the Court analyzes each.

### *(A) Did Defendants' Reason Have "Basis in Fact"?*

The first type of rebuttal generally "consists of evidence that the reasons given by the employer simply did not happen."  *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 471 (6th Cir. 2002).

Plaintiff argues that "Paredes' failure to interview all of the witnesses . . . raises questions of fact as to whether the 'fracas' really happened the way [Defendants] claim[] it did."  (ECF No. 26 at Pg. ID 465.)  This argument fails

because the Sixth Circuit "do[es] not require that the decisional process used by the employer be optimal or that it left no stone unturned.  Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse action."  *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).  Plaintiff submits his own deposition testimony and affidavit as proof that Defendants' reason had no basis in fact.  Plaintiff argues that—contrary to Defendants' contention that "[Plaintiff] was charging" at Doty in an "attacking" and "aggressive mode" and three to five employees "tr[ied] to grab [Plaintiff]" to hold him back, (ECF No. 26-4 at Pg. ID 591, 597, 600-01)—only two colleagues made contact with him:  one colleague put his arm around or hand on Plaintiff, telling him to "calm down," but did not have to "physically try[] to hold [Plaintiff] back," (ECF No. 26-3 at Pg. ID 535), and the other colleague "grabbed [him] by [his] arm" and "then just escorted [him]" away,  (*id.* at Pg. ID 534).  "It's not like[] they [were] physically straining to try to get me out of the area," Plaintiff testified.  (*Id.*)  "[I]t was like in a calmly [*sic*] fashion, walking me out" and "walk[ing] me all the way to [another] office."  (*Id.*)  Plaintiff also declares that "[a]t no time did [he] ever threaten Doty or attempt to make physical contact with him."  (ECF No. 26-2 at Pg. ID 482.)

However, even if—based on his declaration and deposition testimony— Plaintiff has provided some evidence suggesting that he did not "charge" at Doty,

Plaintiff still fails to demonstrate pretext.  This is because, per the Sixth Circuit's

"modified honest belief" rule, Defendants have established that the termination

decision was reasonable *based upon the information available at the time*:

> [The] "modified honest belief" rule [] provides that "'for an employer
> to avoid a finding that its claimed nondiscriminatory reason was
> pretextual, the employer must be able to establish its reasonable
> reliance on the particularized facts that were before it at the time the
> decision was made.'"  *Escher v. BWXT Y–12, LLC*, 627 F.3d 1020,
> 1030 (6th Cir. 2010) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d
> 702, 708 (6th Cir. 2006)).  The employee, in turn, "must be afforded
> the opportunity to produce evidence to the contrary, such as an error on
> the part of the employer that is 'too obvious to be unintentional.'"
> *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 286 (6th Cir. 2012)
> (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).
> To overcome the employer's invocation of the honest belief rule, the
> employee "must allege more than a dispute over the facts upon which
> [the] discharge was based.  He must put forth evidence which
> demonstrates that the employer did not 'honestly believe' in the
> proffered non-discriminatory reason for its adverse employment
> action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).

*Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012).

Employee Statements, each drafted on the day of or after the altercation,

state as follows:

> Mike James, Alex Garett and Mark Doty [b]egan to argue . . . . The
> argument began to become heated and yelling picked up.  The argument
> proceeded into the office where a scrap broke out[.]  Mike James was
> going after Mark and Alex. . . . I watched Jason Thibault hold Mike
> back and attempt to calm him down.  The situation died down after
> Jerem[y] Webster intervened and pulled Mike outside.

(ECF No. 24-6 at Pg. ID 392.)

> I . . . heard an[] [argument] going on between Mike James, Mark Doty
> and Alex Garrett. . . . I s[aw] Jason Thibault holding Mike James back
> from entering his office . . . .  I ran up and got in between Mike James,
> Mark Doty and Alex Garrett to help Jason defuse the situation.  Mike
> James charged toward us[,] and myself and Jason held him back and
> got him out on the deck.

(*Id*. at Pg. ID 393.)

> When I walk[ed] in[,] [t]here w[ere] four [or] five employees
> restraining Mike James Safety Manager from harming a[n] employee.

(*Id*. at Pg. ID 394.)

> James tr[ied] to force[] his way through the door between [Thibault]
> and Jeremy[,] [and they] were trying to hold James back[] from trying
> to get to Alex and Mark.

(*Id*. at Pg. ID 395.)

In addition, Paredes testified that, on the day of the altercation, Plaintiff told

him during a call that he made a motion toward Doty but did not intend to actually

hit Doty.  (ECF No. 26-4 at Pg. ID 591.)

Notably, neither in his declaration nor in his deposition does Plaintiff deny

having told Paredes this on the day of the altercation.  Instead, Plaintiff's

declaration simply states that "[w]hen [Plaintiff] spoke to Paredes on August 24,

2017, [Plaintiff] told him about [Doty's] aggressive and threatening behavior

towards [Plaintiff]."  (ECF No. 26-2 at Pg. ID 481.)

And Plaintiff does not point to any place in the record suggesting that—*at

the time Defendants made their decision*—there was evidence that Plaintiff did not

28

move toward Doty.  Notably, Plaintiff's "Employee Statement"—drafted on the

same day of the altercation—simply states in relevant part:

> I went out to the back deck and Mark came up once again with a[]
> hostile attitude[,] yelling and cussing at me . . . . The conversation got
> heated to the point where it became unprofessional between [me and
> Doty]. . . . [Me, Shoemaker, Bradley, and Thibault] had a discussion . .
> . where I admitted I should have backed off when Mark Doty started
> displaying a belligerent attitude.

(ECF No. 24-11 at Pg. ID 441.)  And while Brezzell states in her declaration that

"[she] could tell from the sound of Doty's voice that he was very angry and

aggressive even though [Plaintiff] remained calm and tried to reason with him,"

Brezzell was not on the line with Plaintiff for the entire duration of the altercation

and she was not physically present to observe Plaintiff's movements.  (ECF No.

26-6 at Pg. ID 649.)

In sum, because the record does not suggest—and Plaintiff does not allege—

that Defendants' were privy to these disputes prior to their decision or that the

version of events Plaintiff detailed during his deposition was shared with

Defendants before they made the termination decision, Plaintiff has failed to

produce evidence demonstrating that Defendants' reliance on the facts before them

at the time of the decision was unreasonable.  Where an employer acts on a good

faith belief that the employee committed the conduct that served as the grounds for

termination, the plaintiff cannot defeat summary judgment by simply arguing that

he did not engage in the alleged conduct.  Indeed, there is insufficient evidence of

pretext in the face of substantial evidence that Defendants had a "reasonably

informed and considered" basis, at the time the decision was made, to believe that

Plaintiff "charged" at Doty.  *Smith*, 155 F.3d at 807; *see also Majewski v.*

*Automatic Data Processing, Inc*., 274 F.3d 1106, 1116 (6th Cir. 2001).

### (B) Did Defendants' Reason Actually Motivate the Adverse Action?

Plaintiff argues that "[a] jury should be allowed to consider whether

McAreavy and Goble's racial animosity influenced Paredes' decision to fire

James."  (ECF No. 26 at Pg. ID 466.)  It appears that Plaintiff is advancing the

"cat's paw" theory of liability.  Under Sixth Circuit law:

> "When an adverse . . . decision is made by a supervisor who lacks
> impermissible bias, but that supervisor was influenced by another
> individual who was motivated by such bias, this Court has held that the
> employer may be held liable under a 'rubber-stamp' or 'cat's paw'
> theory of liability." *Arendale v. City of Memphis*, 519 F.3d 587, 604
> n.13 (6th Cir. 2008). . . . To succeed on a cat's-paw theory, the
> employee "must offer evidence of a 'causal nexus' between the ultimate
> decisionmaker's decision to terminate the [employee] and the
> supervisor's discriminatory animus." *Madden v. Chattanooga City*
> *Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008).  In other words,
> the employee must show that, "[b]y relying on this discriminatory
> information flow, the ultimate decisionmakers acted as the conduit of
> the supervisor's prejudice—his cat's paw." *Id*. at 678 (internal
> quotation marks omitted).  However, a causal nexus is lacking if the
> ultimate decision "was based on an independent investigation" and the
> employee "presented no evidence that the supervisor's discriminatory
> animus had influenced the decision." *Id*.

*Bishop v. Ohio Dep't of Rehab. & Corr.*, 529 F. App'x 685, 696 (6th Cir. 2013).

Here, after the altercation, McAreavy told Paredes and Goble to collect witness statements.  (ECF No. 26-5 at Pg. ID 638.)  In addition, McAreavy testified that, when prompted by Paredes for his opinion, McAreavy said that he was "disappointed that [Plaintiff] did this" and "it would be difficult for the safety manager, after an incident like this, to . . . get [] respect from the guys in the field." (*Id.* at Pg. ID 640.)  Regarding his pre-termination decision conversations with McAreavy, Paredes testified:  "I do remember talking to James Goble and Butch [McAreavy] about the incident . . . [and] we talked about suspending [Plaintiff] until we have done an investigation."  (ECF No. 26-4 at Pg. ID 592.)  Paredes also testified that McAreavy and Goble stated that other employees believed that Plaintiff was going to hit Doty, though Plaintiff had told Paredes that he never planned on hitting Doty.  (*Id.* at Pg. ID 593.)  Paredes further stated that even though McAreavy agreed with Paredes' opinion that Plaintiff's employment should be terminated, the termination decision was ultimately Paredes'.  (*Id.* at Pg. ID 595.)

In this case, the "cat's paw" theory is of no help to Plaintiff.  As an initial matter, when an employee "does not admit the factual basis underlying [the employer's] proffered legitimate reason for his discipline, [this] eliminates the second category of pretext."  *Chattman v. Toho Tenax Am., Inc*., 686 F.3d 339, 349

(6th Cir. 2012).  As previously discussed, Plaintiff does not admit that he "charged" at Doty.  (ECF No. 26-3 at Pg. ID 534-35.)

Even assuming that Plaintiff admits the underlying facts, Plaintiff's argument still fails because he has not brought forward evidence showing that McAreavy's or Goble's comments or actions related to Plaintiff's termination were motivated by discriminatory animus.  In addition, there is no evidence to support a finding that McAreavy or Goble's comments, or any alleged "discriminatory information flow"—as opposed to the investigation conducted by Defendants— were the proximate cause of Plaintiff's termination or otherwise influenced Paredes' decision.  *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008) (explaining that a plaintiff must show that "[b]y relying on this discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice—his cat's paw."); *see also Romans v. Mich. Dep't of Human Servs*., 668 F.3d 826, 836 (6th Cir. 2012) ("[I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable." (internal quotation marks and citation omitted)).

In his brief, Plaintiff argues that "Paredes knew Goble was racist and previously warned James that Goble wanted him gone because, according to Paredes, Goble did not like working with a black man."  (ECF No. 26 at Pg. ID

465.) Plaintiff did not actually testify that this is what Paredes told him. During

his deposition, Plaintiff engaged in the following exchange:

> Q[:]  So, now, my question to you was . . . had [Paredes] ever said
> anything that you believe reflected racial animosity towards you?
>
> A[:]  Yes, due to the fact that, "I need to keep my eyes and 2 ears open,
> head on a swivel, when it comes to James Goebl, because I don't trust
> him.  You got to realize he's a Caucasian man and stuff.  I didn't
> approve of this position that he's got and stuff like that.  I don't trust
> him, and I advise you not to."
>
> Q[:]  How does that reflect animosity against you?
>
> A[:]  Due to the fact that he was telling me a Caucasian man, you know
> what I'm saying, was basically . . . wanting me off that job site because
> he didn't want to work with a black man that was smarter, that's more
> experienced and educated than him, and he knew that.

(ECF No. 26-3 at Pg. ID 542.)

In his brief, Plaintiff appears to be attributing to Paredes, not what Paredes

actually said to Plaintiff, but Plaintiff's interpretation of Paredes' comment.  Even

assuming Paredes told Plaintiff that Goble does not liking working with a black

man, Paredes was not quoting Goble.  At best, Paredes' alleged statement reflects

Paredes' personal perception or opinion regarding discriminatory animus held by

Goble.  Plaintiff did not testify that Paredes pointed to the factual basis underlying

the alleged opinion.  Paredes' unsupported statement, therefore, is not evidence

that Goble did not like working with a black man.

### (C) Was There Insufficient Evidence to Explain the Adverse Action?

Regarding the third method of showing pretext, the Sixth Circuit has explained:

> [The] plaintiff must demonstrate that other employees outside of h[is] protected class were not fired, even though they were similarly situated and engaged in substantially identical conduct to that which the employer contends motivated its decision. *Smith*, 220 F.3d at 762. To be similarly situated, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the *same supervisor*, have been subject to the *same standards* and have engaged in the *same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352.

*Gunn v. Senior Servs. of N. Ky.*, 632 F. App'x 839, 848 (6th Cir. 2015) (emphasis added).

Plaintiff argues that his alleged "charge" at Doty was insufficient to warrant his termination because similar action was not taken against two similarly-situated employees:  Doty and Darnell Cheeks.  Cheeks is an African-American employee, who worked in Toledo, Ohio, and claimed to have been assaulted by a Caucasian employee.

Even assuming that Doty and Plaintiff "dealt with the same supervisor" and were "subject to the same standards," Plaintiff's argument fails because the record at the time of the termination decision suggested that they had not "engaged in the same conduct."  Plaintiff contends that "Doty was raising his voice" and "cursing,"

but nonetheless "got off [s]cot-free."[6]  (ECF No. 26 at Pg. ID 466.)  The difference in Plaintiff's and Doty's conduct, however, is that Plaintiff admitted that Doty did not "come after" him, (ECF No. 26-3 at Pg. ID 535)[7], but the record at that time suggested that Plaintiff "charged" at Doty.  Because Plaintiff has not set forth any evidence that Plaintiff's conduct of "charging" at Doty was insufficient to warrant dismissal, the third way of showing pretext fails as it concerns Doty.[8]

Turning to Plaintiff's argument regarding Cheeks, Plaintiff argues that a Caucasian employee allegedly assaulted Cheeks and was not disciplined.  (ECF No. 26 at Pg. ID 468.)  But in his brief, Plaintiff concedes that the Caucasian employee "had to get between" Cheeks and Kevin (another InfraSource employee)

---

[6] Plaintiff's contention that Doty was not disciplined for "[r]efusing to cooperate with his investigation" may concern Doty's actions prior to the altercation, but it does not concern his actions during the altercation, which is what is relevant to the analysis here.

[7] See Pl. Dep., ECF No. 26-3 at Pg. ID 535 ("Q[:] . . . You're not contending that Mark Doty ever came after you, correct?  A[:]  I mean, pointing his fingers at me, you know, and stuff like that; but as far as him trying to ball his fists up and hit me or anything like that, he did not do that.").)

[8] Plaintiff also argues that "a jury could conclude that [Plaintiff's] behavior, even if insubordinate or unprofessional, was justified considering the racism he experienced at the hands of Doty and others."  (ECF No. 26 at Pg. ID 468.)  To support this argument, Plaintiff quotes the Sixth Circuit in *Yazidan v. ConMed Endoscopic Tech., Inc.*, 793 F.3d 634, 652 (6th Cir. 2015):  "we cannot accept an employer's conclusory claim that an employee was insubordinate when the alleged insubordination consists of refusing to cease what a jury could find to be reasonable [Title VII]-protected activity." (internal quotation marks and citation omitted).  This case is distinguishable because here, unlike in *Yazidan*, Plaintiff was not terminated for "insubordinate" speech.  He was fired because Defendants understood he "charged" at Doty.

"because things were getting physical" between Cheeks and Kevin.  (*Id.* at Pg. ID 458.)  Again, there are "differentiating or mitigating circumstances that would distinguish [Plaintiff's] conduct or [Defendants'] treatment of . . . it," *Ercegovich*, 154 F.3d at 352:  Defendants believed the Caucasian employee's conduct was intended to curb a physical threat, while Defendants viewed Plaintiff's conduct as serving as a physical threat.  (*See* McAreavy Dep., ECF No. 26-5 at Pg. ID 619-20 ("So basically an argument got going.  [The Caucasian employee] saw the argument taking place.  So [he] tried to keep the peace between them and stepped in between them. . . . [The Caucasian employee] wasn't initially involved with it . . . and he basically put his hands on [Cheeks] to keep them separated.").)  Thus, Plaintiff's attempt to show pretext via the third method fails as to Cheeks.

Because no genuine issues of material fact exist as to Plaintiff's race-based termination claim, the Court finds that summary judgment is appropriate.

## CONCLUSION

For the reasons discussed above, the Court finds that genuine issues of material fact preclude summary judgment as to Plaintiff's hostile work environment and failure to promote based on race claims.  However, summary judgment is warranted as to Plaintiff's claim of termination based on race.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (ECF

No. 24) is **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: June 1, 2020